AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>Apple iPhone with a brown case;<br>white & gold Apple iPhone; gray and red SD card</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.  '24 MJ1302 VET</td></tr>
</table>

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein,

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1029(a)(2) and (b)(1) | Unauthoried Access Device Use & Attempted Use |
| 18 USC 1029(a)(4) | Access Device Making Equipment |

The application is based on these facts:

See Attached Affidavit of USSS Special Agent Kevin Rydalch, incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Kevin Rydalch*

*Applicant's signature*

USSS Special Agent Kevin Rydalch

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:  _____04/03/2024_____

*Judge's signature*

City and state:  San Diego, California

Hon. Valerie E. Torres, US Magistrate Judge

*Printed name and title*

## STATEMENT OF FACTS

I, Kevin Rydalch, being duly sworn, state as follows:

1.     I have been employed as a Special Agent with the United States Secret Service (USSS) since March 2007. I am currently assigned to the San Diego Field Office.  I am a graduate of both the USSS Training Center in Beltsville, Maryland and the Federal Law Enforcement Training Center in Glynco, Georgia.  I also have had additional training and on-the-job experience with other federal, state and local law enforcement agents in connection with the investigation of said offenses and related offenses. Based on my training and experience, I am familiar with the methods used to commit wire fraud related offenses.

2.     The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that I or others have learned during this investigation.  Dates, times, and amounts are approximate.

*Overview*

3.     The United States Secret Service (USSS), and the Southern California Cyber Fraud Task Force (SoCal CFTF) are working with state and federal agencies to investigate the theft and misuse of funds electronically distributed to individuals receiving public assistance.

4.     This Affidavit is submitted in support of arrest warrants for Dumitru Ducila UNGURU and Roberto CALIN and warrants to search two Apple iPhones (inventoried under 412-2024-CE-86 and 412-2024-CE-88) and one gray and red micro SD card (inventoried under 412-2024-CE-91) (collectively, the "**subject devices**") for evidence of and relating to access device fraud.

5.      As outlined below, on April 2, 2024, UNGURU and CALIN made a series of unauthorized withdrawals at San Diego County ATMs in which they accessed, stole, and attempted to steal from the public assistance benefit accounts of several victims. Additionally, UNGURU has a documented history of making unauthorized withdrawals at San Diego County ATMs in which he accessed, stole, and attempted to steal from the public assistance benefit accounts of approximately 49 victims.  The SoCal CFTF has also collected the names of the victims from whose EBT accounts UNGURU and CALIN made the prior unauthorized withdrawals.  None of these victims' names match UNGURU OR CALIN.

6.      Law enforcement agency checks show that UNGURU has a Final Order of Deportation, and CALIN has a Pending Order of Deportation.   Due to their immigration status, both UNGURU and CALIN are ineligible for CalFresh or CalWORKS.

*Background on Electronic Benefit Transfer Cards*

7.      In 2022, California's Department of Social Services (CalDSS) advised the SoCal CFTF that it had detected a rise in fraud associated with the electronic debit cards issued to individuals and families who qualify for California public benefits like CalFresh and CalWORKS.

8.      The U.S. Department of Agriculture also noticed a rise in fraud associated with the Supplemental Nutrition Assistance Program (SNAP) that it administers through its Food and Nutrition Service (FNS). SNAP is a federally funded assistance program designed to help low-income individuals and families purchase food. In California, SNAP public assistance benefits are distributed through CalFresh and loaded to an account that a qualified recipient access by means of an access card, similar to a debit or credit card, called the California Advantage Electronic Benefit Transfer (EBT) Card. The EBT card system was developed to enable government agencies in California and many other states to deliver public assistance benefits to recipients using

electronic transfers. The EBT system is a computer-based system through which authorization for qualifying food purchases and cash withdrawals are received via either a point-of-sale (POS) terminal or an ATM.

9.      The U.S. Department of Health and Human Services, Administration for Children and Families, administers the Temporary Assistance to Needy Families (TANF) program.  TANF is a federally funded assistance program that awards grants to individual states to support low-income families with children.  In California, TANF grant funds are used to operate CalWORKS, a state public assistance program that provides cash aid to eligible families with one or more children in the home.  Families that apply and qualify for ongoing CalWORKS assistance receive money each month to help pay for housing, food, and other necessary expenses.  Like CalFresh, CalWORKS benefits are distributed by CalDSS through the California Advantage EBT card.

10.      After a recipient applies for, and is approved to receive, California public assistance benefits like CalFresh and CalWORKS, the benefits are automatically distributed to the recipient's EBT card on a designated day of the month (typically, in California, the first five days of the month). To access their benefits to purchase eligible food items, recipient swipe their card through a point-of-sale terminal, or insert it into an ATM, that records the card number, date, time, and amount of the transaction. The recipient then enters his/her unique Personal Identification Number (PIN) into a keypad to complete the transaction.

11.      The SoCal CFTF has gathered evidence indicating that members of what appear to be one or more criminal enterprises are stealing California EBT account information by installing skimmers on point-of-sale terminals, often by targeting point-of-sale terminals at large volume retailers, like Walmart, in communities with higher concentrations of public benefit recipients. The skimmed data is then often re-encoded onto the magnetic strips of cards that members of the conspiracy use to make

unauthorized withdrawals and purchases. These re-encoded cards are sometimes referred to as "cloned" cards. Cloned cards can be a blank white plastic card, or another debit, credit, or gift card. Cloned cards may have names or numbers embossed on the physical face of the card. A common feature of cloned cards is that the account number encoded on the card's magnetic strip will not match the number embossed on the card's face. To facilitate the use of the stolen EBT benefits, members of the scheme will commonly put stickers bearing the account's PIN on the physical cards, or access devices, that are swiped at a point-of-sale terminal along with the account balance.

12.    Data provided by CalDSS indicates that, between approximately June 2022 and February 2024, in the Southern District of California and elsewhere, unauthorized account users have stolen approximately $181,208,693.00 from CalWORKS recipients.  These unauthorized withdrawals commonly occur at the start of each month, when monthly CalWORKS benefits are distributed.  Most of the stolen funds were obtained through unauthorized ATM withdrawals.

13.    In July and August 2022, the SoCal CFTF learned of connected incidents at Walmart stores in Chula Vista, National City, and Sherman Heights involving overlay skimmers that appeared to be part of an EBT fraud scheme.[1]  According to police reports and records obtained by the task force, in June 2022, National City Police arrested a Romanian national who was caught installing an overlay skimmer without authorization

Type text here

---

[1] An overlay skimmer is a skimmer that is part of a counterfeit faceplate designed to resemble the legitimate point-of-sale terminal. Overlay skimmers are mounted to the legitimate point-of-sale terminal and allow a victim's credit or debit card to be read by the legitimate terminal. In the process of inserting the victim's credit or debit card into the legitimate terminal, the card is also read by the overlay skimmer, which stores the card's stolen electronic information for later unauthorized use. The overlay skimmers that target EBT cards are not designed to read credit or debit cards embedded with a chip (i.e., most credit and debit cards). Unlike most bank-issued credit and debit cards, EBT cards do not have chips (which makes the cards less expensive). The overlay skimmers that cannot read cards with chips therefore typically target EBT cards.

AFFIDAVIT IN SUPPORT OF COMPLAINT                -4-

at a National City Walmart. The suspect had at least one coconspirator assist him with the installation. In July 2022, employees at a Chula Vista Walmart discovered an unauthorized overlay skimmer installed on a point-of-sale terminal. Store surveillance footage showed that the individual arrested by National City Police had, along with his unidentified coconspirator, installed the overlay skimmer at the Chula Vista Walmart two days before his arrest in National City. When arrested by National City Police, the suspect presented a fake European ID that misrepresented his name and nationality Record checks revealed his true name, Romanian nationality, and indicated that he had entered the U.S. without inspection. Additional investigation revealed that this individual, or someone closely matching his appearance, had installed an overlay skimmer at a Sherman Heights Walmart in March 2022 with the assistance of two additional coconspirators.

14.     In spring 2023, the USSS conducted operations in the Southern and Central Districts of California during which it surveilled ATMs that had historically been used to make unauthorized EBT account withdrawals.    During the March operation in Los Angeles, the USSS arrested 14 individuals. During its June 2023 operation, the USSS-San Diego and SoCal CFTF arrested five individuals, along with a sixth individual in July 2023.   Five of the six individuals arrested in San Diego County had a history of making of unauthorized EBT account withdrawals in San Diego prior to the night of their arrest and all six had one or more phones on them when arrested. Several of these individuals had also previously installed skimming devices on point-of-sale terminals or inside ATMs, and/or were found in possession of access-device making equipment at the time of their arrest.  Of the 20 people arrested in Southern California between March and July 2023, all but one were Romanian.  Many of the Romanians arrested possessed fake European IDs.

15.     As part of its broader investigation into the theft of EBT account benefits, the SoCal CFTF has obtained warrants to seize and search the phones of individuals

engaged in skimming and EBT access device fraud activities.  The consistent pattern is that individuals engaged in these activities are using phones in furtherance of the fraud. Examples include using phones to store and transmit stolen EBT account information, using phones to communicate with coconspirators in furtherance of the fraud, using phones to reserve and manage access to short-term rental accommodations and rental vehicles, using phones to navigate and for other location-related searches and services, using phones to conduct balance inquiries on stolen EBT accounts to determine the amount of the benefit and the date it will be deposited, and using phones to record and photograph fraud-related activities.

<u>UNGURU's Historical Fraud Activities</u>

16.     As part of its broader EBT fraud investigation, the SoCal CFTF collects surveillance images and transaction records for fraudulent EBT withdrawals at San Diego County ATMs.  Through the review of these and related records, the SoCal CFTF has documented UNGURU's involvement in the following prior fraudulent EBT withdrawals:

a.     On July 3, 2023, near 6 a.m., UNGURU went to an ATM in the 4100 block of El Cajon Blvd in San Diego. UNGURU attempted to withdraw $13,690 from the EBT accounts of sixteen victims. The victims were all from San Diego County. Of the attempted withdrawals, UNGURU successfully withdrew $10,820 over sixteen transactions.

b.     On October 1, 2023, near 6 a.m., UNGURU went to an ATM in the 4100 block of El Cajon Blvd in San Diego. UNGURU attempted to withdraw $15,800 from the EBT accounts of twenty victims. The victims were from San Diego and Los Angeles Counties. Of the attempted withdrawals, UNGURU successfully withdrew $14,520 over twenty transactions.

c.     On January 1, 2024, near 2 a.m., UNGURU went to an ATM in the 600 block of Carlsbad Village Drive, City of Carlsbad.   UNGURU attempted to

withdraw $7,790 from the EBT accounts of eights victims. The victims reside in San Diego and Los Angeles Counties. Of the attempted withdrawals, UNGURU successfully withdrew $7,790 over eight transactions.

       d.    On January 2, 2024, shortly after midnight, UNGURU went to an ATM in the 4100 block of El Cajon Blvd in the city of San Diego. UNGURU attempted to withdraw $5,240 from the EBT accounts of seven victims. The victims reside in San Diego, Riverside and Los Angeles Counties. Of the attempted withdrawals, UNGURU successfully withdrew $2,240 over eight transactions.

<u>Arrests of UNGURU and CALIN</u>

17.    On the morning of April 2, 2024, the USSS and SoCal CFTF initiated an operation to target EBT-related fraud in San Diego County. The operation focused on ATMs where fraudulent EBT withdrawals had previously occurred. The selected ATMs were all for banks that operate in interstate and foreign commerce and whose headquarters are outside California.

18.    On the morning of April 2, 2024, at approximately 0600 hours, law enforcement observed two individuals, approach a set of three ATMs located at 4166 El Cajon Blvd, San Diego, CA. This is the same location where UNGARU had made prior fraudulent EBT withdrawals. The two individuals, later identified as UNGURU and CALIN, parked across the street from the ATMs in a gray Chevrolet Traverse (CA 7PKX551), with a clear line of sight of the walk-up ATM.

19.    After UNGURU and CALIN exited the vehicle and approached the ATM, law enforcement observed them conduct approximately five transactions at the ATM over approximately two minutes. Both UNGURU and CALIN returned to the Chevrolet Traverse. Approximately five minutes later, CALIN exited the Chevrolet Traverse, and returned to the same ATM. Again, law enforcement observed him conduct approximately two more transactions at the ATM over approximately two minutes. During these transactions, law enforcement observed UNGURU and CALIN

insert what appeared to be an access device card at the ATM and press the ATM keypad, likely to enter a PIN. The transactions appeared to be cash withdrawals based on law enforcements observations of cash being removed from the ATM. Based upon my training and experience, while not inherently illicit, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time. Similarly, most legitimate ATM users do not conduct what appears to be counter-surveillance before/during/after making ATM withdrawals.

20.     While UNGURU and CALIN were at the ATM, law enforcement received contemporaneous information from CalDSS while UNGURU and CALIN were conducting the multiple observed withdrawal transactions. CalDSS confirmed that a withdrawal attempt occurred at 0601 hours, for $600, on an EBT account ending in 7489. This attempt failed due to an incorrect PIN code. This transaction attempt took place on an EBT account belonging to an individual named C.H. Law enforcement also received contemporaneous information from California's Department of Motor Vehicles confirming that the individual conducting the ATM withdrawals did not appear to match the individual, C.H.., in whose name the EBT account was registered.

21.     UNGURU and CALIN returned to their parked car together. Approximately five minutes later, CALIN returned to the ATM alone.

22.     After observing approximately two additional transactions, CALIN departed the ATM location and then returned to their car. The two men remained inside the parked car, without moving, while continuously watching the set of three ATMs. They remained inside the vehicle, without moving or leaving their parking spot for approximately three hours. Based on my training and experience, I believe UNGURU and CALIN were watching the ATM and waiting for the appropriate time to remove their ATM skimming equipment.

23.     At approximately 0900 hours, law enforcement observed UNGURU and CALIN exit their vehicle and walk across the street and return to the ATM.  UNGURU was seen removing an object from inside the ATM and placing it in his left jacket pocket.  Both UNGURU and CALIN quickly returned to their Chevrolet Traverse.

24.     While surveilling UNGURU and CALIN, officers ran a registration check for the Chevrolet Traverse they were driving.  California DMV records indicated the Chevrolet Traverse's registration had expired on December 24, 2023, and there was no current registration on file.  There was also no current insurance listed for the vehicle.

25.     Based on the date, time, ATM location, presence of multiple, successive ATM withdrawals on multiple EBT cardholder accounts during a short time period, mismatch of identities between UNGURU and CALIN and the name on an EBT account they accessed, the amount of time spent in their vehicle watching the ATM, and their suspected removal of an ATM skimming device, law enforcement detained UNGURU and CALIN to investigate further.   UNGURU and CALIN were stopped while inside the Chevrolet Traverse and before it left the parking lot.  UNGURU was in the driver seat, and CALIN was in the front passenger seat.

26.     Officers asked UNGURU and CALIN to step out of the vehicle, which they did.  During a protective pat-down, officers discovered that UNGURU possessed one ATM deep insert skimming device and approximately $1,280 of U.S. currency.  In my training and experience, this cash likely reflected the proceeds of unauthorized EBT withdrawals from earlier in the day.

27.     Incident to a protective pat-down of CALIN, officers discovered he possessed one cloned EBT card, in the form of a white Stater Bros. $10 gift card with a sticker on the front with the handwritten numbers 7447 and 650.  In my training and experience and that of my colleagues, this four-digit number is often the account PIN and the "650" likely represented $650, or the available account balance.  Law enforcement confirmed the gift card was a cloned EBT card by reading the magnetic

stripe and determining through CalDSS that the account number ended in 7489, which was the same EBT account UNGURU and CALIN used to attempt a $600 transaction. CalDSS also confirmed that this EBT account belonged to other real individuals, neither of whom were UNGURU or CALIN.

28.     The surveillance team included members of the California Highway Patrol (CHP).   The CHP officers advised members of the SoCal CFTF that CHP had to impound the vehicle due to its expired registration.   CHP officers then searched the vehicle to inventory items prior to having it towed.   CHP discovered under the front driver side floor mat one pinhole camera device, with an ATM skimmer removal tool stuck to the back.   An additional $80 was discovered in the center console of the Chevrolet Traverse.

29.     When asked to identify himself, UNGURU provided the name "Dumitru" and date of birth of October 13, 2003. UNGURU also possessed an ID from Romania bearing the name "Dumitu Ducila UNGURU." When asked to identify himself, CALIN provided his name and date of birth of September 26, 2004.  CALIN also produced an ID from Romania bearing his name.

30.     Based upon the above relevant facts, the SoCal CFTF conducted a probable cause arrest of UNGURU and CALIN on April 2, 2024, at approximately 0930 hours.

31.     At the time of their arrest, CALIN possessed a white and gold Apple iPhone, inventoried under USSS item number 412-2024-CE-88.  Also, under the front passenger seat was an Apple iPhone with a brown case, inventoried under USSS item number 412-2024-CE-86 (two of the **subject devices**).  The phones were seized incident to arrest and inventoried.  At the SoCal CFTF office, agents removed one gray and red micro SD card from the pinhole camera, which was labeled "32 GB sanDisk Ultra Plus" (the third **subject device**).

32.     I submit there is probable cause to search these two Apple iPhones and the one micro SD card (the **subject devices**) for evidence of and relating to skimming and EBT fraud-related activity.  As outlined in part above, individuals engaged in similar activities in Southern California have been shown to use their phones to communicate with coconspirators, research ATM locations, navigate, store and record fraud-related information (e.g. electronic account information, photos and videos of contraband), conduct balance inquiries via phone and the Internet, and facilitate travel and lodging while conducting fraud-related activities.  Both UNGURU and CALIN appeared knowledgeable about both installing skimming-related equipment and making EBT withdrawals, which indicates, in my opinion, that this was not the first time engaging in this fraud.  Accordingly, this affidavit seeks authorization to search both cell phones seized UNGURU and CALIN for evidence from July 3, 2024 through and including April 2, 2024.

Procedures for Electronically-Stored Information

**Cell Phones**

33.     It is not possible to determine, merely by knowing the cellular phone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the

device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

34. Following the issuance of this warrant, the USSS will collect the subject cellular telephone and subject it to analysis. If there are technological challenges, the examiners may need to consult with other law enforcement partners. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

35. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (**90**) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

36. The United States is unaware at this time of other attempts to search the subject devices.

## CONCLUSION

37. Based on the evidence described above, I submit there is probable cause to believe that UNGURU and CALIN used unauthorized access devices, in the form of victims' EBT account information, on April 2, 2024 and that his use of these access devices resulted in a loss of over $1,000.00, in violation of 18 U.S.C. § 1029(a)(2) and

(b)(1) (use and attempted use of unauthorized access devices). In particular, since July 3, 2023, UNGURU has attempted to withdraw approximately $42,520 from victims' EBT accounts, of which he successfully withdrew $35,370, and CALIN aided and abetted the unauthorized withdrawals that occurred on April 2, 2024 and appear to have totaled over $1,000.00. I further submit that there is probable cause to believe that, on April 2, 2024, UNGURU and CALIN possessed access device making equipment in the form of an ATM deep insert skimming device and pinhole camera, in violation of 18 U.S.C. § 1029(a)(4) (device making equipment). Finally, I submit there is probable cause to search the **subject phones** seized from UNGURU and CALIN for evidence of and relating to access device fraud based on the evidence, opinions, and experience described above.

*Kevin Rydalch*

_____
Special Agent Kevin Rydalch
UNITED STATES SECRET SERVICE

## ATTACHMENT A

## PROPERTY TO BE SEARCHED

The following property is to be searched:

    a.  Apple iPhone with a brown case (inventoried under USSS item number 412-2024-CE-86);

    b.  White and gold Apple iPhone (inventoried under USSS item number 412-2024-CE-88);

    c.  One gray and red SD card labeled "32 GB sanDisk Ultra Plus" (inventoried as 412-2024-CE-91 item #3);

(collectively, the **"Target Devices"**).

The Target Devices are currently in the custody and control of U.S. Secret Service at 550 W. C St, Suite 660, San Diego, CA 92101.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the Target Devices described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Devices for evidence described below. The seizure and search of the Target Devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Devices will be electronic records, communications, and data such as emails, text messages, mobile messaging application content, social media content, images, records from third-party and websites applications (e.g., Google Maps), photographs, audio files, videos, browsing history, and location data, for the period of July 3, 2023, up to and including April 2, 2024, for the following:

    a.    Communications, records, images, videos, electronic files, and attachments tending to discuss or pertain to access device (e.g., EBT cards, debit cards, the electronic track data embedded on such cards) or account information associated with such Device (e.g., PINs, names), including but not limited to the unauthorized use, interception, collection, transfer, or possession of such Device or related account information;

    b.    Communications, records, images, videos, electronic files, and attachments tending to discuss or pertain to skimming device, or the location or manner in which such Device are installed, deployed, distributed, collected, or manufactured;

    c.    Communications, records, images, videos, electronic files, and attachments tending to discuss or reflect an intent to i) steal or misuse access Device, or account information associated with such device, or ii) install, deploy, distribute, collect, or manufacture unauthorized skimming Device, that would tend to discuss or establish motive,

opportunity, intent, preparation, plan, knowledge, absence of mistake, or lack of accident, with regard to the crimes under investigation;

d.       Communications, records, images, videos, electronic files, and attachments tending to discuss, reflect, or pertain to the proceeds, fruits, or instrumentalities of or from the use of unauthorized access Device like EBT account information, credit card information, or debit card information;

e.       Communications, records, images, videos, electronic files, and attachments tending to discuss, reflect, or pertain to the proceeds, fruits, or instrumentalities of or from the production, control or custody, or possession of access device-making equipment;

f.       Communications, records, images, videos, electronic files, and attachments tending to identify the user(s) of, or persons with control over or access to, the Target Device, including the telephone number associated with any of the Target Device and, without any date restriction, all contact entries;

g.       Communications, records, images, videos, electronic files, and attachments tending to identify the user(s) of the Target Device's state of mind, knowledge, motive, and voluntariness regarding the crime under investigation, such as any communications, records, or attachments demonstrating knowledge that EBT or debit or credit card account information, PINs, victim names, skimmers, or access Device were being used without authorization or with an intent to deceive;

h.       Communications, records, images, videos, electronic files, and attachments tending to identify or establish the use of fake or stolen personal identification information, such as the names or PINs found on California Advantage cards;

i.       Communications, records, images, videos, electronic files, and attachments tending to identify any co-conspirators, co-schemers,

criminal associates, or others involved in a scheme to steal or misuse access device card information; and

j.    Communications, records, images, videos, electronic files, and attachments that provide context to any communications, records, images, videos, electronic files, and attachments described above, such as electronic messages sent or received in temporal proximity to any relevant electronic message and any content tending to identify the user(s) of the device to be searched;

**which are evidence of violations of 18 U.S.C. §§ 1029(a)(2) and (b)(1) (use and attempted use of unauthorized access device), and 1029(a)(4) (access device-making equipment).**